**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Nikki Elliott,<br>Plaintiff,<br>v.<br>Payactiv, Inc.<br>Defendant. | Court File No.: __________<br>**Complaint**<br>**Jury Trial Demanded** |

## INTRODUCTION

Defendant Payactiv, Inc. ("Payactiv") is an unlicensed, app-based payday lender operating under the pretense of an employer benefit. Payactiv markets its payday loans directly inside employer timekeeping and payroll software, placing high-cost, short-term loan solicitations as employer "perks" into the payroll interface used by employees to manage their paycheck. By capturing hourly wage-earners inside their mandatory workplace routines, Payactiv exploits a captive audience of vulnerable workers, harvesting illegal fees and trapping them in high-APR debt cycles.

## PARTIES

1. Plaintiff Nikki Elliott is an individual who lives in North Branch, Minnesota.

2. Payactiv is a corporation organized in the state of Delaware with a registered office address located at 251 Little Falls Drive, Wilmington, Delaware.

3. Payactiv's principal place of business is located at 400 N. McCarthy Blvd., Suite 100, Milpitas, California.

4. Payactiv offers, markets, originates, and services consumer short-term loans to employees across Minnesota through a mobile application integrated with workplace employer payroll systems.

5. Payactiv is not registered to do business in Minnesota.

6. Payactiv does not hold a license as a consumer short-term lender with the commissioner of commerce of Minnesota as required by Minn. Stat. § 47.601 subd. 6(b)(1).

## JURISDICTION

7. Jurisdiction arises under 28 U.S.C. § 1331 and under 15 U.S.C. § 1640(e).

8. This Court has supplemental jurisdiction over Elliott's state law claims under 28 U.S.C. § 1367.

9. Venue is proper in this district because a substantial part of the events giving rise to the claim occurred here.

## STATUTORY FRAMEWORK: REGULATION OF SHORT-TERM LENDERS IN MINNESOTA

10. The Minnesota Consumer Short-Term Loans Law, Minn. Stat. § 47.601, strictly regulates short-term loans to Minnesota borrowers. A "Consumer short-term loan" is defined under Minn. Stat. § 47.601, subd. 1(e) as

> a loan to a borrower which has a principal amount, or an advance on a credit limit, of $1,300 or less and requires a minimum payment within

> 60 days of loan origination or credit advance of more than 25 percent of the principal balance or credit advance.[1]

11. Anyone engaging in the business of short-term lending to consumers must obtain a license from the Minnesota Commissioner of Commerce. Consumer short-term lending broadly includes entities that:

> (1) Make or arrange consumer short-term loans, other than a state or federally chartered bank, savings bank, or credit union;
>
> (2) This includes but is not limited to any substantial involvement in facilitating, marketing, lead-generating, underwriting, servicing, or collecting consumer short-term loans.[2]

12. For the purposes of this law, a person is a consumer short-term loan lender subject to the requirements of this section if the totality of the circumstances indicate that a person is a lender and the transaction is structured to evade the requirements of this section.[3]

13. Under Minn. Stat. § 47.601, subd. 2(e), a consumer short-term lender may charge an annual percentage rate up to 50 percent, but no other charges or payments are permitted or may be received by the lender in connection with a consumer-short term loan.

14. The law further mandates specific written contract disclosures, bold 24-point APR warnings, and strictly prohibits provisions choosing an out-of-state forum or waiving class actions.

---

[1] Minn. Stat. § 47.601, subd. 1(e) (as amended by c 57 art 3 s 7-10, eff. 2023).
[2] Minn. Stat. § 47.601, subd. 1(f)
[3] Minn. Stat. § 47.601, subd. 5a(b).

## PAYACTIV'S ILLEGAL AND PREDATORY LENDING SCHEME

15. Elliott is employed as a bartender at both Bradford Pub & Grub, located in Cambridge, Minnesota, and Route 65 Pub & Grub, located in East Bethel, Minnesota.

16. To manage employee time tracking and payroll, Elliott's employers require her to use a mobile application called Paychex to clock in and out of every shift.

17. Embedded within Elliott's Paychex app is a section called "My Perks."

18. The My Perks tab of the Paychex app purports to list the "[e]xtra services provided through your employer" that are available to Elliott.

19. Among these extra services available to Elliott through her time-tracking app are: financial wellness products, discounts on insurance, and financial products like Payactiv, which markets itself in Elliott's app as "Pay on Demand."

20. Because Elliott must use the Paycheck app as a condition of her employment, she is a captive audience. Payactiv takes advantage of this relationship by marketing high-cost consumer short-term loans to her.

21. When a worker clicks on the Payactiv "benefit" within the Paychex app, it prompts the employee to download the separate Payactiv app.

22. Once the employee has downloaded the Payactiv app, they are prompted to link their Payactiv account with their employer's payroll processor.[4]

[4] Common payroll processing companies include Paychex and ADP.

23. Through this link to the employee's payroll processor, Payactiv is able to see how many hours an employee has worked, their hourly wage, their next pay date, and the next paycheck amount.

24. When an employee opens the Payactiv app, the interface deceptively co-brands the portal using the employer's name, in Elliott's case displaying options such as "Bradford Pub & Grub Inc's EWA."[5]

25. Payactiv further embeds timecard graphics directly into its loan interface, displaying daily shift entries (e.g. 8 hours worked, $42.08 earned) side-by-side with cash advance offers (e.g. "Accessible today: $21.04). This user interface integration creates an inherently deceptive environment where captive workers reasonably believe they are completing an official workplace payroll draw rather than entering into an unlicensed, high-cost credit agreement carrying effective APRs from 126% to over 3,700% per annum.

26. Payactiv engages in an explicit bait-and-switch scheme regarding transfer fees. On its selection screen, Payactiv affirmatively represents to the user that real-time transfers to an account are "Available in real time—No fee". However, when the worker proceeds to the confirmation screen, Payactiv tacks on a mandatory $4.99 "express" fee.

27. On its public website (payactiv.com), Payactiv markets its products by claiming it allows employees to access earned wages "on-demand from the app".

---

[5] EWA stands for earned-wage access, the term used by digital payday loan lenders to describe their products.

28. Payactiv markets its service to employers as a workplace perk, claiming on its website that its "free or low cost options help save an average of $200 a month in overdrafts, late fees and high-interest loans". In reality, however, Payactiv's instant advances are far more expensive than mainstream credit products.

29. Each advance offered by Payactiv constitutes a separate, discrete, closed-end consumer credit transaction. The loan is disbursed via automatic deposit into the employee's bank account and later repaid through an automatic payroll deduction from the employee's paycheck. Accessing a subsequent advance requires a wholly independent transaction request, and the legal obligation of each individual advance is completely extinguished upon repayment on or around payday, leaving no continuous revolving balance.

30. Payactiv takes no financial risk in making these digital payday loans because the loan, plus all fees, is paid back automatically on the employee's next payday and additional loan offers are contingent on the employee having accrued enough future pay to ensure Payactiv is paid back.

31. Payactiv holds the predominant economic interest in these short-term loans because Payactiv—not the employer—sets underwriting rules, controls repayment, and collects and retains the $4.99 instant delivery fees.

32. When calculated as finance charges under Minn. Stat. § 47.601 and 15 U.S.C. § 1606 over short repayment periods (typically 5 to 18 days until the next scheduled payday), Payactiv's $4.99 fees yield effective Annual Percentage Rates (APRs)

ranging from 126% to over 3,700% per annum—massively exceeding Minnesota's 50% statutory APR cap.

33. Payactiv operates a scheme of systematic fee harvesting. Payactiv charges a $4.99 fee per advance. While $4.99 appears small in isolation, when imposed on micro-loans over short pay periods, it exceeds the legal interest limit set by Minn. Stat. § 47.601 by many orders of magnitude.

34. Payactiv's automatic payroll deduction mechanism triggers an often inescapable cycle of debt churning. When Payactiv deducts the principal advance plus its fee from a worker's paycheck, it creates an immediate financial deficit in the worker's subsequent pay period. To cover basic living expenses following a depleted paycheck, the captive worker is forced to take out repeated advances, generating more $4.99 fees for Payactiv.

35. Between April 23, 2026, and August 25, 2026, Payactiv subjected Elliott to this exact fee-churning cycle.

## ELLIOTT'S TRANSACTIONS

36. In spring of 2026, Elliott began experiencing financial difficulties.

37. She noticed the Payactiv "perk" in her time-tracking app, downloaded the separate Payactiv app, and linked it to her employer's payroll processing company.

38. On April 23, 2026, Elliott took out her first $78 advance from Payactiv. It was repaid fifteen days later, on May 8, 2026, with a fee of $4.99 added, for a total of $82.99.

39. Between April 23, 2026, and August 25, 2026, Payactiv subjected Elliott to this exact fee-churning cycle, extracting 67 separate short-term loans totaling $2,083.00 in principal and harvesting $334.33 in illegal finance charges. Across the entire transaction history, Elliott repaid a total of $2,417.33 in combined principal and fees to Payactiv.

40. Upon information and belief, at no time during this period was Payactiv licensed by the Minnesota Commissioner of Commerce as required by Minn. Stat. § 47.601 subd. 2(a)(3)(i).

41. In connection with these short-term loans, Payactiv systematically violated Minn. Stat. § 47.601, subd. 2 by imposing standard form contracts that:

- Contained an illegal forum selection clause designating mandatory arbitration for dispute in violation of Minn. Stat. § 47.601 subd. 2(a)(2);
- Contained an illegal provision limiting class actions against a consumer short-term lender in violation of Minn. Stat. § 47.601 subd. 2(a)(3);
- Failed to disclose the name; address, which may not be a post office box; and telephone number of the lender in violation of Minn. Stat. § 47.601 subd. 2(c)(1);
- Failed to disclose the name and title of the individual employee or representative who signs the contract on behalf of the lender in violation of Minn. Stat. § 47.601 subd. 2(c)(2);
- Failed to provide an itemization of the fees and interest charges to be paid by the borrower in violation of Minn. Stat. § 47.601 subd. 2(c)(3).

- Failed to provide the required disclosure, in bold, 24-point type, of the annual percentage rate ("APR") as computed under United States Code, chapter 15, section 1606, in violation of Minn. Stat. § 47.601 subd. 2(c)(4);
- Failed to provide a written description of the borrower's payment obligations under the loan in violation of Minn. Stat. § 47.601 subd. 2(c)(5).

42. When calculated as a finance charge under Minnesota law, the $4.99 fee on the April 23, 2026 loan represents an APR of 156%, more than triple the statutory maximum set by Minn. Stat. § 47.601 subd. 2(e). Each loan taken subsequently charged an effective APR between 126% and 3,700%.

43. If these charges were not interest, then they constituted unauthorized fees that directly violated Minn. Stat. § 47.601 subd. 2(e), which prohibits any other charges or payments in connection with a consumer short-term loan.

## JURY TRIAL

44. Elliott requests a jury trial. FED. R. CIV. P. 38.

## CAUSES OF ACTION

### Count I – Violation of Minnesota Consumer Short-Term Loans Law

45. Payactiv is a "consumer short-term lender" within the meaning of Minn. Stat. § 47.601 subd. 1(f).

46. Payactiv made at least 67 consumer short-term loans to Elliott without a license from the Minnesota Commissioner of Commerce and in direct violation of multiple substantive lending provisions under Minn. Stat. § 47.601 subd. 2,

including charging illegal interest and/or fees, as well as including prohibited contract terms while omitting required contract disclosures.

47. As a direct result of Payactiv's violations of Minn. Stat § 47.601, Elliott is entitled to statutory remedies under Minn. Stat. § 47.601 subd. 6 including:

- Disgorgement and return of all money collected or received in connection with the loans;
- Actual, incidental and consequential damages;
- Statutory damages of up to $1,000.00 per violation;
- An order declaring each of the loan contracts void and unenforceable; and
- Costs, disbursements and reasonable attorney's fees.

## COUNT II – VIOLATION OF TRUTH IN LENDING ACT

48. Payactiv is a "creditor" that regularly extends closed-end consumer credit under 15 U.S.C. § 1602(g).

49. Elliott is a "person" as defined by 15 U.S.C. § 1602(e).

50. All of Elliott's advances from the Payactiv app were used for personal, family, and household purposes.

51. All of Elliott's advances were for one-time, fixed disbursements. Therefore, the payday advances were not "open end credit" as defined by 15 U.S.C. § 1602(j).

52. The mandatory $4.99 fees charged by Payactiv are "finance charges" under 15 U.S.C. § 1605(a) because there were charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.

53. For each of the closed-end loan transactions, Payactiv failed to provide Elliott with written TILA disclosures before consummation as required by 15 U.S.C. § 1638 and 12 C.F.R. §§ 1026.17-18, including:

- The identity of the creditor;
- The “amount financed”;
- Itemization of the amount financed;
- The finance charge;
- The “annual percentage rate”;
- The “total of payments”;
- The payment schedule; and
- Descriptive explanations of all statutory terms.

54. Pursuant to 15 U.S.C. § 1640(a), Payactiv is liable to Elliott for actual damages, statutory damages per violation, and reasonable attorney’s fees and costs.

## COUNT III – CONSUMER FRAUD ACT

55. Elliott is a “consumer,” as defined by Minn. Stat. § 325F.70, subd. 3(b)(1).

56. Payactiv’s short-term credit products constitute “merchandise” as defined by Minn. Stat. § 325F.68 subd. 2.

57. Elliott’s receipt of the loans were “sales,” as defined by Minn. Stat. § 325F.68, subd. 4.

58. Minnesota’s Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, prohibits any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise.

59. Payactiv engaged in deceptive practices and false pretenses by:

- Marketing high-cost credit as an "earned wage access" employee perk inside mandatory workplace payroll tools;
- Deceptively co-branding short-term loans under employer names (e.g. "Bradford Pub & Grub Inc's EWA") to exploit workplace trust;.
- Affirmative bait-and-switch pricing by falsely advertising instant transfers as "Available in real time – No fee" on selection screens, only to assess a $4.99 finance charge on confirmation screens.

60. Under Minn. Stat. § 325F.69, subd. 8, Payactiv's practices are unfair and unconscionable because they:

- Offend public policy regulating short-term lenders under Minn. Stat. § 47.601;
- Are unethical, oppressive, and unscrupulous by exploiting captive workers in financial distress; and
- Cause substantial injury to consumers through forced debt churning and illegal fee harvesting.

61. Payactiv broadly markets its unlicensed short-term products to thousands of hourly wage earners across Minnesota through software integrations. Enjoining Payactiv's deceptive practices and enforcing Minnesota's statutory lending rules protects the general public and vulnerable workers statewide from systemic, usurious debt traps.

## PRAYER FOR RELIEF

Elliott requests that judgment be entered against Payactiv:

1. For return of $2,417.33 paid by Elliott to Payactiv under Minn. Stat. § 47.601 subd. 6;

2. For actual, incidental and consequential damages under Minn. Stat. § 47.601 subd. 6;

3. For statutory damages under Minn. Stat. § 47.601 subd. 6 in an amount to be determined at trial up to the maximum permitted by law per violation;

4. For the costs of litigation and reasonable attorney's fees under Minn. Stat. § 47.601 subd. 6

5. For an order under Minn. Stat. § 47.601 subd. 6 declaring the loans void and unenforceable.

6. For injunctive relief prohibiting Payactiv from offering illegal loans to Minnesota Consumers;

7. For actual damages under 15 U.S.C. § 1640(a)(1);

8. For statutory damages under 15 U.S.C. § 1640(a)(2) in an amount determined at trial up to the maximum amount permitted by law per violation;

9. For the costs of litigation and reasonable attorney's fees under 15 U.S.C. § 1640(a)(3);

10. For actual damages plus reasonable attorney fees and costs under Minn. Stat. § 325F.70, subd. 3.

**ATTORNEYS FOR NIKKI ELLIOTT**

Date: October 8, 2026

*s/ Todd Murray*

Todd Murray (#347462)
**Friedman Murray, PLLC**
1400 Van Buren St NE, Suite 200
Minneapolis, MN 55413
todd@friedmanmurray.com
(612) 564-4025 (phone)

David Friedman (#390796)
**Law Office of David Friedman, PLLC**
4 Westchester Park Drive, Suite 155
White Plains, NY 10604
*david@davidfriedmanlaw.com*
(914) 222-3612 (phone)